FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

SEP 29 2015

JAMES W. McCORMACK, CLERK
By:_____ DEP CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
LITTLE ROCK DIVISION

BRANDON SCROGGIN                          PLAINTIFF

V.             CASE NO. 4:15cv606-DPM

SOUTHERN COLLECTION SYSTEMS,
BANK OF THE OZARKS, BANK OF
THE OZARKS INC., and STEPHANIE
HURST                         DEFENDANTS

## COMPLAINT

Comes now the Plaintiff, Brandon Scroggin (hereinafter "Scroggin"), by and through his counsel, Leigh Law PLLC., and for his Complaint against Defendants Southern Collection System (hereinafter "SCS"), Bank of the Ozarks (hereinafter "Ozarks"), and Stephanie Hurst (hereinafter "Hurst") respectfully states as follows:

## INTRODUCTION

Plaintiff brings this Complaint seeking statutory, actual, and punitive damages, as well as attorney fees and costs, for violations of the *Fair Debt Collection Practices Act (hereafter "FDCPA") § 15 U.S.C. 1692 et seq., Arkansas Fair Debt Collection Practices Act (hereafter "AFDCPA") § 17-24-101 et seq., Arkansas Deceptive Trade Practices Act (hereafter "ADTPA") A.C.A. §§ 4-88-101 through 4-88-115, Fair Credit Reporting Act 15 USC § 1681 et seq.*, and *The Racketeer Influenced and Corrupt Organizations Act (hereinafter "Rico") 18 U.S.C. §§ 1961-1968.*

## JURISDICTION AND VENUE

1.     Jurisdiction is conferred on this Court pursuant to the *FDCPA 15 U.S.C. § 1692k(d); A.C.A. 2010 § 17-24-512(d); ADTPA § 4-88-113(f); FCRA, 15 USC § 1681p;* RICO, *18 U.S.C. § 1964(a), (b) and (c),* and *28 U.S.C. § 1331.*

This case assigned to District Judge Marshall
and to Magistrate Judge Volpe

2. Based on information and belief, an arbitration clause may exist in Ozarks contract which Scroggin signed; and if so, Scroggin reserves the right to exercise any arbitration provision discovered during these proceedings. Furthermore, Scroggin elects AAA as the arbitration forum, if arbitration is elected by Scroggin, and if such forum is designated in the arbitration clause.

3. As Plaintiff's state claims are related to Plaintiff's federal claims, and Plaintiff's state claims are inextricably entwined and arise out of a common nucleus of related facts, form part of the same controversy under Article III of the United States Constitution, are not complex or novel and are straightforward, this Court has supplemental jurisdiction to hear and adjudicate Plaintiff's state claims against the Defendant pursuant to *28 U.S.C. § 1367*.

4. Venue is proper as all alleged conduct took place while the Plaintiff was residing in North Little Rock, Arkansas.

## PARTIES

5. Brandon Scroggin is an individual, natural person, and a consumer, residing in North Little Rock, Arkansas, and was an "individual," "natural person,", and a "consumer" at all times as alleged in this Complaint.[1]

6. Defendant Ozarks is a bank and a for profit corporation in good standing with the Arkansas Secretary of State, with a filing number of 200000198. Defendant Ozarks is also a "person," as defined pursuant to the *ADTPA § 4-88-102(5)*, which defines a person as, "an individual, organization, group, association, partnership, *corporation*, or any combination of them."

---

[1] Pursuant to *15 U.S.C. § 1692(a)(3) & A.C.A. § 17-24-502(2)*, a "consumer" means any natural person obligated or allegedly obligated to pay any debt. Pursuant to *15 U.S.C. § 1681a(c)*, a consumer means an individual; pursuant to *FCRA, 15 U.S.C. § 1681a(b)* the term "person" means an individual, partnership, corporation, trust, estate, cooperative, association, government or governmental subdivision or agency, or other entity.

7.    Defendant Hurst is a natural person, who based on information and belief is a resident of the State of Arkansas. At all times as alleged in this Complaint, Hurst was an employee of Ozarks.

8.    Defendant SCS, located at 11518 Fairview Drive, Little Rock, Arkansas, 72212, is a "debt collector," in so far as debt collector is defined pursuant to *15 U.S.C. § 1692a(6)* and *A.C.A. § 17-24-502(5)(A)*,[2] which regularly engages in consumer-debt-collection activity,[3] is a furnisher of information to credit reporting agencies.

## RELEVANT PRECEDENT AND STATUTORY STRUCTURE OF THE FDCPA AND THE AFDCPA

9.    Scroggin incorporates by reference and re-alleges paragraphs (1) through (8).

10.    "The purpose of the FDCPA is to 'eliminate abusive debt collection practices by debt collectors,' ... and debt collectors are liable for failure to comply with 'any provision' of the Act." Richmond v. Higgins, 435 F.3d 825, 828 (8th Cir.2006) (quoting 15 U.S.C. §§ 1692(e), 1692k(a)) (internal citations omitted).[4]

11.    Whether conduct violates the FDCPA is to be determined by analyzing the conduct from the perspective of the least sophisticated consumer. Freyermuth v. Credit Bureau Servs., Inc., 248 F.3d 767, 771 (8th Cir. 2001) (quoting, Duffy v. Landberg, 215 F.3d 871, 873 (8th Cir. 2000).

---

[2] A "debt collector" is any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another. *15 U.S.C. §1692a(6) & A.C.A. § 17-24-502(5)(A)*.

[3] Defendant SCS was attempting to collect a "debt," from Scroggin, in so far as "debt" is defined pursuant to *15 U.S.C. 1692a(5)*, which defines debt as, "any obligation or **alleged obligation** [emphasis added] of a consumer to pay money arising out of a transaction in which the money, property, insurance or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment."

[4] The FDCPA is a strict liability statute which covers both intentional and unintentional violations. Strand v. Diversified Collection Serv., Inc., 380 F.3d 316, 317 (8th Cir. 2004).

12. A debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt. *15 U.S.C. § 1692f & A.C.A. § 17-24-507(a).* Duffy v. Landberg 215 F.3d 871 (8th Cir. 2000)(holding, "the FDCPA prohibits debt collectors from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt)).

13. If a consumer notifies a debt collector in writing that the consumer refuses to pay a debt, the debt collector **shall not** [emphasis added] communicate further with the consumer with respect to such debt, except-

    1) to advise the consumer that the debt collector's further efforts are being terminated;

    2) to advise the consumer that the debt collector or creditor may invoke specified remedies which are ordinarily invoked by such debt collector;

    3) where applicable, to notify the consumer that the debt collector or creditor intends to invoke a specified remedy. *15 U.S.C. § 1692(c)c.* Pace v. Portofino Recovery Associates, 12-274 (8th Cir. 2013).

14. A debt collector's response to a "cease communication" [refusal to pay] notice from the consumer may not include a demand for payment. Federal Trade Commission Staff Commentary on the FDCPA, April 20, 2014; and Lewis v. ACB Business Services Inc. 135 F.3d 389 (6th Cir. 1998).

15. A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. *15 U.S.C. § 1692e.*

16. A debt collector who misrepresents the character, amount, or legal status of any debt violates the FDCPA. *15 U.S.C. § 1692e(2)(A).*

17. The bona fide error defense is limited to clerical errors. Picht v. Jon R. Hawks, Ltd., *236 F.3d 446, 451 (8th Cir. 2001).*

18. This case presents the question whether the "bona fide error" defense applies to a violation resulting from a debt collector's mistaken interpretation of the legal requirements of the FDCPA. **"We conclude it does not."** [emphasis added] <u>Supreme Court of the United States, Jerman v. Carlisle, McNellie, Rini, Kramer & Ulnch LPA,</u> No. 08-1200, 130, 1605; *176 L Ed. 2D 519; 2010 Lexis 3480 (April 21, 2010).*

19. Any debt collector who fails to comply with **any provision** [emphasis added] of the Act, with respect to any person, is liable to such person for actual damages. *15 U.S.C. § 1692k(a)(1) & A.C.A. § 17-24-512(a)(1).*

20. Any debt collector who fails to comply with any provision of the Act, with respect to any person, is liable to such person for statutory damages up to $1,000.00. *15 U.S.C. 1692k(a)(2) & A.C.A. § 17-24-512(a)(2)(A).*

21. In the case of a successful action to enforce the foregoing liability, a debt collector is liable for the costs of the action, together with a reasonable attorney's fee as determined by the court. *15 U.S.C. §1692k(a)(3) & A.C.A. § 17-24-512(a)(2)(A).*

## **RELEVANT PRECEDENT AND STATUTORY STRUCTURE OF THE ADTPA**

22. Scroggin incorporates by reference and re-alleges paragraphs (1) through (21).

23. Engaging in any unconscionable, false or deceptive act or practice in business, commerce or trade violates the ADTPA. *A.C.A. § 4-88-107(a).* The Arkansas Supreme Court has interpreted this language as a broad catch-all provision that encompasses conduct defined as deceptive under other substantive areas of law. See, e.g., <u>Bryant,</u> *336* Ark. at 295-97, 985 S.W.2d at 302-03 (applying the ADTPA to claims arising out of the usury prohibition in the Arkansas Constitution).

24. Any person who suffers actual damage or injury as a result of an offense or violation under the ADTPA, has a cause of action to recover actual damages, if appropriate, and reasonable attorney's fees. *A.C.A. § 4-88-113(f)*.

## RELEVANT PRECEDENT AND STATUTORY STRUCTURE OF THE FCRA

25. Scroggin incorporates by reference and re-alleges paragraphs (1) through (25).

26. The FCRA prohibits information furnishers from providing information to a Credit Reporting Agency (hereafter "CRA") that they know or have reasonable cause to believe is inaccurate. *FCRA, 15 U.S.C. § 623(a)(2)*.

27. If a consumer notifies a furnisher that the consumer disputes the completeness or accuracy of any information reported by the furnisher, the furnisher may not subsequently report that information to a CRA without providing notice of the dispute. *FCRA 15 U.S.C. § 623(a)(3)*.

28. Furnishers must comply with federal regulations that identify when an information furnisher must investigate a dispute made directly to the furnisher by a consumer. Under these regulations, furnishers must complete an investigation within thirty (30) days unless the dispute is frivolous or irrelevant or comes from a "credit repair organization." *FCRA 15 U.S.C. § 623(a)(8)*.

29. Under the FCRA, any person who is negligent in failing to comply with any requirement imposed under this title with respect to any consumer is liable to that consumer in an amount equal to the sum of:

1) Any actual damages sustained by the consumer as a result of the failure; and

2) In the case of any successful action to enforce any liability under this section, the costs of the action together with reasonable attorney's fees as determined by the court. *FCRA 15USC§ 168lo(a)*.

30. Under the FCRA, any person who willfully fails to comply with any requirement imposed under this title with respect to any consumer is liable to that consumer in an amount equal to the sum of:

1) Any actual damages sustained by the consumer as a result of the failure or damages of not less than $100.00 and not more than $1,000.00;

2) Such amount of punitive damages as the court may allow; and,

3) In the case any successful action to enforce any liability under this section, the costs of the action together with reasonable attorney's fees as determined b y the court. *FCRA 15 USC § 1681n(a)*.

31. Individual consumers may sue for willful or negligent failure to comply with the investigation requirements. Mcivor v. Credit Control Services. Inc., No. 14-1164 (8th Cir. Dec.4, 2014).

## FACTS COMMON TO ALL COUNTS

32. Scroggin incorporates by reference and re-alleges paragraphs (1) through (31).

33. In 2014 Scroggin opened a consumer checking account at Bank of the Ozarks, 101 North Rodney Parham Road, Little Rock, Arkansas, 72212.

34. The primary use of the checking account was for items and services primarily for Scroggin's personal services and use.

35. Approximately three months after opening the checking account, Scroggin noticed fraudulent charges to his account.

36. As soon as Scroggin noticed fraudulent charges to his account, he personally visited Bank of the Ozarks, and spoke with Defendant Hurst, the branch manager.

37. After Hurst reviewed the account, she informed Scroggin that his checking account routing number and account number were being used to initiate charges through an automated clearing house [ACH].

38. Scroggin advised Hurst that he did not authorize any debits or online checks from the merchant that made the charges against Scroggin's account.

39. Hurst advised Scroggin it would be $70.00 to stop payment on the online checks, which Hurst admitted Scroggin had not written nor contained his signature authorizing the charges and debits to his account.

40. Scroggin advised Hurst that he was the victim of fraud and was not going to pay $70.00 to stop payment on checks he did not write, that were not even paper checks but online checks, and the bank should protect his account.

41. Scroggin made it clear to Hurst this was not a merchant dispute, but a clear case of fraud.

42. Scroggin signed documents which Hurst requested, stating that Scroggin was alleging fraud against his account and did not make or authorize the charges made against his Bank of the Ozarks checking account.

43. Scroggin recommended to Hurst that his account information be closed and then re-opened or that his routing and checking account numbers be changed.

44. Hurst advised Scroggin this was not necessary.

45. Scroggin specifically told Hurst not to authorize any other charges that were made online, and certainly anymore by the party that had fraudulently used Scroggin's Bank of the Ozarks checking account.

46. Scroggin, before leaving Ozarks, told Hurst that he was fully expecting that Ozarks would handle the matter and that he had no intention of paying the stop payment charges.

47. A few days after Scroggin visited Ozarks and met with Hurst, Hurst, with no appointment and unannounced, showed up at Scroggin's employer asking to meet with Scroggin.

48. Scroggin stopped a meeting he was in and met with Hurst.

49. Hurst advised Scroggin that if he would sign what appeared to be a dispute document that she would waive the $70.00 fee she had demanded Scroggin pay to Ozarks. Scroggin signed what Hurst requested he sign.

50. Before Hurst left Scroggin's employer, he again advised there were to be no other online authorizations approved by the bank, and again agreed to close his account and re-open another.

51. Hurst advised Scroggin she had the issue taken care of and there was no reason the account needed to be closed and/or another account opened by Scroggin.

52. Approximately a week later, Scroggin noticed overdraft charges posting to his Bank of the Ozarks checking account.

53. Scroggin immediately called Ozarks and was informed that each time an attempt to charge his account, by the same merchant Scroggin had specifically advised Hurst and Ozark was fraudulent, a $39.00 overdraft charge was posted to the account, because the attempted charges against the account caused the account to go in the negative.

54. Scroggin again advised Ozarks the attempts were fraudulent and there was no justification for charging fees to Scroggin's account. Scroggin explained the entire chain of events to Ozarks.

55. Scroggin emailed Hurst, disputing the charges, and inquiring why she was allowing the fraud against his account to continue.

56. Hurst responded that since Scroggin did not originally stop payment on the two fraudulent charges, she was not waiving anymore fees for Scroggin.

57. Scroggin again informed Hurst the bank charges were a result of attempted fraud against Scroggin.

58. Hurst advised Scroggin the fees were not the fault of Bank of Ozarks and Scroggin would be responsible for the bank charges against his account.

59. Scroggin demanded his account be closed and another account in his name not to be re-opened.

60. Scroggin Demanded Hurst remove the overdraft bank charges against his account.

61. Hurst refused to remove the fees, **even after admitting that Ozarks did not pay the debits against Scroggin's account** [emphasis added].

62. Scroggin advised Hurst her actions were deceptive and outrageous.

63. Hurst then informed Scroggin, by email, that she had reported Scroggin's account to the "security officer" and that Scroggin needed to immediately bring his account current by taking care of the approximate $600.00 in bank fees.

64. Scroggin asked Hurst what she meant by reporting the account to her "security officer." Hurst responded that she reports all delinquent and overdrawn accounts to her security officer. Scroggin advised Hurst she was making it appear this was a criminal matter, when all Scroggin was doing was refusing to pay charges he was not responsible for.

65. Scroggin again demanded his account be closed, and advised Hurst he was not paying their [Ozarks] bank fees, due to them allowing the charges to go through, thereby causing Scroggin's account to go negative and accumulate even more charges.

66. Hurst threatened Scroggin that she would report him to her collection agency and report to his credit in a negative manner, if he did not quickly take care of Ozarks' fees.

67. Scroggin put Hurst on notice that he would sue her and Ozarks if she authorized the poisoning to his credit report.

68. Approximately three weeks later, Scroggin received an initial letter from SCS; a demand for payment in full was made; and a warning that the account was going to be reported to his credit was also contained in the letter.

69. Scroggin immediately responded to SCS by sending a dispute letter to SCS, informing SCS the charges they were trying to collect was a result of fraud, Scroggin had already reported the fraud to Ozarks, and that Scroggin did not owe the debt they were attempting to collect.

70. In addition, Scroggin [a consumer], in writing, stated to SCS [a debt collector] that he "**refused to pay this debt**" [emphasis added].

71. Approximately two weeks after SCS signed for Scroggin's dispute and refusal to pay directive, SCS sent to Scroggin his last bank statement from Ozarks, and advised this was the information he requested.

72. Scroggin immediately sent a second letter to SCS, stating he did not request the bank statement that he had received from SCS, again disputed the debt advising he did not owe the debt alleged, and informed SCS he would sue if they [SCS] put the account on his credit report.

73. Approximately three weeks later, and after SCS had received Scroggin's refusal to pay letter thereby invoking a cease communications directive, SCS sent another collection letter to

Scroggin. The letter stated they [SCS] did not understand why Scroggin was still refusing to pay the debt and could not understand why he [Scroggin] was refusing to contact SCS to make arrangements to pay the debt.

74. The letter referenced in the above paragraph made a clear demand for payment of Scroggin to pay the debt which Scroggin had previously advised SCS in writing, and which SCS received, that he refused to pay the debt they were once again demanding that Scroggin immediately pay.

75. On or about March 24, 2015, SCS began reporting to Scroggin's credit reports in a negative manner, alleging Scroggin owed $647.00 to Bank of the Ozarks, which was the debt Scroggin disputed he owed and which he advised SCS that he refused to pay.

76. SCS reported the debt each month to each of Scroggin's three credit reports.

77. SCS did not report to the credit bureaus that Scroggin had disputed the debt that SCS alleged Scroggin owed to Ozarks.

78. From April of 2015, and as of the filing of this Complaint, SCS continues to report monthly and in a negative manner to Scroggin's credit reports.

79. From April of 2015, and as of the filing of this Complaint, SCS continues to fail to report to the credit reporting agencies that the debt which they allege Scroggin owes is disputed by Scroggin.

80. Scroggin has made demands of SCS to stop its illegal reporting and that Scroggin would litigate if they did not.

81. SCS has ignored Scroggin's demands that SCS comply with the law.

82. Scroggin's credit score has suffered, and continues to suffer, as a result of SCS's reporting to Scroggin's credit reports.

83.     On or around August 8, 2014, Scroggin was denied rental of an apartment unless the account SCS was reporting to Scroggin's credit reports was paid in full or settled in full, and noted the same on Scroggin's credit report.

84.     On or around August 8, 2015, Scroggin was advised by Steve Landers Auto Complex that his interest rate would be 13%, since Scroggin had a **recent collection account** [emphasis added] on his reports, and that he would have qualified for a lower rate but not for the recent negative collection account by SCS.

85.     As a direct and proximate result of SCS's negative reporting to Scroggin's credit reports, Scroggin has experienced, fear, anger, anxiety, embarrassment, mental anguish, and loss of enjoyment of life.

## COUNT ONE:  VIOLATIONS OF THE FDCPA

86.     Scroggin incorporates by reference and re-alleges paragraphs (1) through (85).

87.     SCS's voluntary conduct has violated the FDCPA; specifically, *15 U.S.C. § 1692(c)*. Scroggin informed SCS in writing, and which SCS received, that "I [Scroggin] refuse to pay this debt." However, and irrespective of Scroggin's cease communications directive which was invoked by Scroggin's refusal to pay letter, SCS continued to demand payment from Scroggin for the debt which Scroggin refused to pay; and, SCS had not received a clear waiver of Scroggin's cease communications directive.

> "Other than as permitted by 1692c(c), a debt collector who has received a cease communications order from a debtor must not contact the debtor unless it has received a "clear" waiver of that order." See, Clark v. Capital Credit & Collection Services, 460 F.3d 1162 (2006); and Herbert v. Monterey Financial Services, Inc., 863 F.Supp. 76 (D. Conn. 1994).

88.     The collection letter demanding payment of Scroggin was not one of the narrowly defined exceptions under the Act which would give SCS safe harbor from FDCPA liability.

89. Demanding payment from Scroggin, after Scroggin's refusal to pay letter, violates the FDCPA.

90. Scroggin did not demand validation of the debt from SCS; however, even if he had, a debt collector can validate a debt and comply with the consumer's cease communications directive.

> "A consumer's written demand to the collector that it verify the debt pursuant to § 1692g and otherwise cease all other communication effectively invoked the § 1692 c(c)'s cease communication remedy and did not improperly attempt to "have it both ways," and the collector's subsequent communications other than to provide verification, comprised of an additional dun and affidavits of forgery for the consumer to sign, violated § 1692c(c)." See, Johnson v. Equifax Risk Mgmt. Servs., 2004 WL 540459 (S.D.N.Y. Mar 17, 2004).

91. SCS's reporting of Scroggin's alleged debt to the credit reporting agencies is further collection activity against Scroggin, thereby again violating *15 U.S.C. § 1692c(c)*.

> "The court has learned through its work on countless FDCPA cases that threatening to report **and reporting debts** [emphasis added] to CRAs is one of the most commonly-used arrows in the debt collector's quiver. See, Edeh v. Midland Credit Mgmt., Inc., 2010 WL 3893604 (D. Minn. Sept 29, 2010).
>
> Banks v. Ford Motor Credit, 2005 WL 43981 (N.D. Tex. Jan. 7, 2005)(rejecting the argument that sending false information about a delinquent payment to a credit reporting agency was not debt collection conduct))

92. SCS violated the FDCPA, specifically, *15 U.S.C. § 1692f,* as it is unfair for SCS to report to the credit reporting agencies, in a negative manner, that Scroggin owed/owes a debt to Ozarks, when Scroggin is not legally indebted to Ozarks.

> "Statutory proscriptions using general terms such as unfairness are to be given effect by considering public values beyond simply those enshrined in the letter or encompassed in the spirit of the statute." See, Federal Trade Commission v. Sperry & Hutchinson Co., 405 U.S. 233 S. Ct. (1972).

93. SCS violated the FDCPA, specifically, *15 U.S.C. § 1692f*, as it was unfair to make written demands of Scroggin, that Scroggin pay a debt he did not owe.

> "The FDCPA's bona fide error defense does not shield the debt collector from liability when it relies on information from the creditor in sending collection letters demanding payment." See, Owen v. I.C. System, Inc., 629 F.3d 1263 (11th Cir. 2011).
> Congress responded to "abundant evidence of the use of abusive, deceptive and unfair debt collection practices by many debt collectors," with 15 U.S.C. § 1692(a), by enacting a comprehensive, detailed remedial scheme that imposes civil liability on debt collectors who engage in a range of prohibited conduct, without regard to their knowledge or intent. See Russell v. Equifax A.R.S., 74 F.3d 30 (2d Cir. 1996) ("Because the Act imposes strict liability, a consumer need not show intentional conduct by the debt collector to be entitled to damages").
> Debt collectors may not make false claims, period." Randolph v. IMBS, Inc., 368 F.3d 726, 733 (7th Cir. 2004).
> "[I]gnorance is no excuse." Turner, 330 F.3d at 995.
> "The FDCPA is a strict liability statute, and debt collectors whose conduct fails short of its requirements are liable here respective of their intentions. Ruth v. Triumph P'ships, 577 F.3d 790 (7th Cir. 2009)."

94. Thus, for purposes of establishing liability under the FDCPA, it does not matter whether SCS knew that the amount it sought to collect from Scroggin was not legally owed by Scroggin and intended to make a false representation, or whether it relied blindly on its client.

95. SCA further violated the FDCPA, specifically, *15 U.S.C. § 1692f*, as it is unfair for SCS to violate the FCRA in connection with the collection of a debt against Scroggin; specifically, by reporting to the credit reporting agencies that Scroggin owed a debt to Ozarks when Scroggin does not legally owe such alleged debt. In other words, it is a *per se* violation of the FDCPA when SCS violated the FCRA.

96. SCS violated the FDCPA, specifically, *15 U.S.C. § 1692f*, as it is unfair for SCS to violate the FCRA in connection with the collection of a debt against Scroggin; specifically, by

failing to report that Scroggin disputes the alleged debt, when reporting Scroggin's alleged debt to the credit reporting agencies. In other words, it is a *per se* violation of the FDCPA and FCRA.

97. SCS violated the FDCPA, specifically, *15 U.S.C. § 1692f*, as it is unfair for SCS to violate the AFDCPA in connection with the collection of a debt against Scroggin. In other words, it is a *per se* violation of the FDCPA when SCS violated the AFDCPA.

98. SCS further violated the FDCPA, specifically *15 U.S.C. § 1692e*, as it was a false representation made by SCS to Scroggin that Scroggin owed a debt which he did not legally owe.

99. Hurst and Ozarks are vicariously liable for SCS's violations of the FDCPA as they hired SCS and directed SCS to demand payment from Scroggin for a debt Scroggin is not legally liable, and to poison Scroggin's credit reports by providing the information to SCS which it reported to the credit reporting agencies. SCS's illegal conduct targeting Scroggin was done under the direction of Hurst and Ozarks.

## COUNT TWO: VIOLATIONS OF THE AFDCPA

100. Scroggin incorporates by reference and re-alleges paragraphs (1) through (99).

101. SCS, Hurst and Ozarks violations of the FDCPA are all *per se* violations of the AFDCPA, specifically, *A.C.A. §§ 17-24-504a(c) & 17-24-507(a)*.

## COUNT THREE: VIOLATIONS OF THE FCRA

102. Scroggin incorporates by reference and re-alleges paragraphs (1) through (101).

103. SCS violated the FCRA, specifically, *FCRA, 15 U.S.C. § 623(a)(2)*, when it reported negative, false, and inaccurate information about Scroggin, to Scroggin's credit reports. "[M]erely reporting whatever information a creditor furnished is not reasonable." See, Swoager v. Credit Bureau, 608 F. Supp. 972, 976 (D.C. Fla. 1985).

104. SCS violated the FCRA, specifically, *FCRA 15 U.S.C. § 623(a)(3)*, as SCS, after being advised in writing that Scroggin disputed the alleged debt, failed to report to the credit reporting agencies that Scroggin disputed the alleged debt which they [SCS] were reporting to Scroggin's credit reports.

105. Hurst and Ozarks are vicariously liable for the FCRA violations of SCS, as Hurst and Ozarks provided the inaccurate information about Scroggin to SCS; and they authorized SCS to poison Scroggin's credit report with information they knew was inaccurate; as Hurst and Ozarks knew Scroggin was not legally liable for the alleged underlying debt, as the alleged underlying debt was a result of fraud against Scroggin.

## COUNT FOUR: VIOLATIONS OF THE ADTPA

106. Scroggin incorporates by reference and re-alleges paragraphs (1) through (105).

107. SCS, Hurst, and Ozarks conduct which violates the FDCPA, ADTPA, and FCRA are *per se* violations of the ADTPA, specifically, *A.C.A. § 4-88-107(a)(10)*.

## COUNT FIVE: VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONSACT ("RICO")

108. Scroggin incorporates by reference and re-alleges paragraphs (1) through (107).

109. All Defendants violated RICO. Ozarks manages a banking and financial enterprise, which enterprise carried out a pattern of racketeering and conspiracy against Scroggin, and then committed actual fraud against Scroggin with a continuous series of racketeering activity using the credit reporting system, a system which it had custody and control over which information would be transmitted to Scroggin's credit reports, to intentionally and willfully damage and destroy Scroggin's credit, because Scroggin refused to be extorted by Hurst and Ozarks.

110. Hurst used her position as bank manager to imply to Scroggin that his conduct was criminal in nature, by stating to Scroggin she was reporting him to her bank's security officer.

111. Hurst, using the enterprise Bank of the Ozarks, conspired with Defendant SCS to intentionally destroy Scroggin's credit, when Hurst, Ozarks, and SCS knew Scroggin was the victim of fraud; Ozarks never paid any monies to the party attempting fraud against Scroggin therefore Ozarks was out no monies; yet still targeted Scroggin and used Bank of the Ozarks, in an attempt to intimidate and use coercion against Scroggin by using the credit reporting system to in essence attempt to blackmail Scroggin into paying a debt which there was no question he did not legally owe.

112. The "predicated acts" against Scroggin, triggering civil RICO liability are, fraud, coercion, extortion, and financial institution fraud.

113. All predicated acts targeting Scroggin have occurred in the past ten years.

114. But for the RICO activity targeting Scroggin, Scroggin would not have suffered damages, because Scroggin's credit would not have been poisoned and Scroggin would not have experienced the damages stated in paragraph 85 of this Complaint.

115. Hurst was an employee of the enterprise Ozark and SCS received financial compensation from the enterprise Ozark.

## PRAYER FOR RELIEF AND DAMAGES

116. Scroggin incorporates by reference and re-alleges paragraphs (1) through (115).

117. Scroggin prays for statutory damages, against all Defendants, in the amount of $1,000.00 (One-Thousand Dollars and 00/100), for violations of the FDCPA.

118. Scroggin prays for statutory damages, against all Defendants, in the amount of $1,000.00 (One-Thousand Dollars and 00/100), for violations of the AFDCPA.

119. Scroggin prays for actual damages, against all Defendants, in the amount of $10,000.00 (Ten-Thousand Dollars and 00/100) for emotional distress and anxiety, for violations of the FDCPA.

120. Scroggin prays for actual damages, against all Defendants, in the amount of $10,000.00 (Ten-Thousand Dollars and 00/100) for emotional distress and anxiety, for violations of the AFDCPA.

121. Scroggin prays for actual damages under the FDCPA, against all Defendants, in the amount of $647.00 (Six-Hundred Forty-Seven Dollars and 00/100), the amount SCS is alleging to Scroggin's credit reports he owes to Ozarks, which Scroggin does not legally owe to Ozarks.

122. Scroggin prays for actual damages under the AFDCPA, against all Defendants, in the amount of $647.00 (Six-Hundred Forty-Seven Dollars and 00/100), the amount SCS is alleging to Scroggin's credit reports he owes to Ozarks, which Scroggin does not legally owe to Ozarks.

123. Scroggin prays for statutory damages in the amount of $21,000.00 (Twenty-One Thousand Dollars and 00/100) for willful violations of the FCRA, which is $1,000.00 (One-Thousand Dollars and 00/1000) per credit report per month, for a total of $3,000.00 (Three-Thousand Dollars and 00/100) per month for every month which SCS has reported in a willfully inaccurate manner to Scroggin's credit reports.

124. Scroggin prays for actual damages, against all Defendants, specifically, emotional distress, shock, anger, and anxiety, in the amount of $10,000 (Ten-Thousand Dollars and 00/100), for violations of the FCRA.

125. Scroggin prays for punitive damages, against all Defendants, in the amount of 75,000.00 (Seventy-Five Thousand Dollars and 00/100), approximately 3 (three) times the amount of the actual and statutory damages, for willful violations of the FCRA. "The FCRA permits a

private action for willful violations of the act, and entitles a consumer to actual, statutory, and punitive damages." See, Safeco Ins. Co. of America v. Burr, 551 U.S. 47 (2007) at 53.

126. Scroggin prays for actual damages of emotional distress, against all Defendants, in the amount of $10,000.00 (Ten-Thousand Dollars and 00/100), for violations of the ADTPA.

127. Scroggin prays that all damages be trebled, due to violations of Civil RICO.

128. Scroggin prays for his attorneys fees and costs under the FDCPA, AFDCPA, ADTPA, RICO, and this Court's inherent authority.

129. Scroggin prays for any other damages the Court deems just and proper.

## JURY TRIAL DEMAND

130. Scroggin incorporates by reference and re-alleges paragraphs (1) through (129).

131. Scroggin demands trial by jury.

Respectfully Submitted,

LEIGH LAW PLLC
PO Box 21514
Little Rock, AR 72221
501.227.7627 Office
501.227.7628 Fax
v@leigh-law.com

_____
Victoria Leigh, ABN 2011257